Our first case, 2022-1473, Mr. Burns. Thank you, Your Honor. Good morning. May it please the Court. In looking at this case, I want to just start with some context that I think defines how the case should be decided. As you can see from the record, Mr. Katz worked on what was called the cellular abductor tracking system, which is an electronic basically phone device that can gather information from a 300-yard radius, be remotely activated. He was approved to work on that by the head of the agency themselves, the DEA administrator, and due to medical conditions and because he found a secure facility at no cost at Fort Bragg, the agency itself at the highest levels agreed to transfer them there to work on that specific project as actually part of his underlying accommodation. That went fine. He hired Cherokee Nation, the largest 8-8 contractor in the country. And to – Counsel, why don't we really get to the facts relating to this case? He would have had these personnel actions even if he hadn't made these disclosures. No, I – we don't believe – That was a finding, right? That was a finding, but the finding wasn't supported by substantial evidence or, frankly, any evidence because under the third car factor was never met. In fact, the second one wasn't met. The court found that he made protected disclosures, that each of his personnel actions that he suffered was a result of the – essentially conducted by the supervisors who he made the disclosures to and then decided that they would have done so anyhow based solely on their uncorroborated, actually contested and unsupported – without documentary supported testimony that they simply would have done this anyway without a single comparator. There wasn't – in fact, not only were there no comparators, his actual supervisors, his former supervisor, then current supervisor, and even the decisionmaker who made the decision to transfer him all testified that it had never happened like this before and that essentially this was a, you know, a cause unique. And so the agency never met its comparators. Also the – Weren't the alleged personnel actions taken before the protected disclosures? No. Every – as you look from the record, the reason I was talking about the Katz program, Mr. Katz's initial disclosures occurred in 2017 when Michael Delacorte transferred the program from a well-recognized 8A contractor to a company largely run by an interior designer whose husband and everyone else there was a DEA official who used to work with Mr. Delacorte at 8A who, in the record, made no ethics determination because he asked himself if there was anything wrong with that and they said no. The second part of the contract with Mr. Katz complained that they had burdened the contract by having Edward Zane come into work who did not know essentially what he was doing, increase the cost of the contract. The fact of the protected disclosure occurred because the underlying contract at a $22 million cost was transferred to a company that was largely DEA employees who used to work with the decision-maker. And because he reported that in 2017 to Andrew Larch, throughout the entire period right up until April of 2019, he continued to make disclosures. The actual adverse actions against him didn't begin to occur until March, and that was after he and Thomas Bordenaro had not only gone to the OIG, they had gone to the FBI and said there's something wrong with this contract, there's overruns, and it's not making any sense, and this is not working. And so they made a protected disclosure of both the most fundamental aspect of what a government official is supposed to do, which is to officially run a contract at the least taxpayer cost and with the most efficient personnel. And we know the entire contract was a scam because they hired the same persons to work on it, then declared they were independent contractors. That was the underlying order. Would you agree that if the adverse actions taken against Mr. Katz occurred prior to his disclosures that no comparator would be necessary? Well, I'm not sure because that's a bit of a hypothetical because prior to his disclosures, he was an exemplary employee who always got awards from the highest levels of the agency. I mean, even the fabricated notion that the issue that came up... It seems to me that the record shows that the actions started snowballing before the disclosures came. No, the actions started snowballing after he went to Andy Large and raised issues about the award of Compass. And Large, to some extent, protected him from Delacorte for a period of time, and so when Large left, he was unprotected. But the disclosures about the Katz contract came earlier. They came to Andy Large where my client said, no, this is not the way, this is cronyism. Then when Edward Zane was put on the contract, he actually complained not only to his managers, but to the company now running the contract, and that was in November of 2018. Just setting aside the facts in this case for just a moment. Sure. Just as a matter of law, you do agree with me, right, that if the adverse actions took place prior to the disclosures, then no comparator is necessary. You don't get to the comparator analysis. Well, I think that's even more fundamental. If the actions occurred before the protected disclosures, he's not a whistleblower. I mean, the fundamental aspect of whistleblowing is I make the disclosure. And there was a finding made by, in this case. Yes. Yes. And the problem, again, the problem with the findings of facts is they're not supported by substantial evidence. I want folks to understand, because I actually did the underlying hearing, every single thing Mr. Katz said was backed up by a document or another manager. Chip McBrayer was not some lowly employee. He was his manager. Andy Large was his manager. Terundolo, who actually made the transfer decision, said the only reason I made it, and as you pointed out, the Katz-Claw theory in Miller, the only reason I made it is because Delacorte and McGuire were in my office every day saying, you've got to transfer this guy. There is no showings of, quote, misconduct. There is no showing in the record, no evidence. Nobody from the Navy came in and said, this contract isn't being run well. Oh, this is a joke. There is nothing in the ‑‑ there's no documentary or substantive evidence or no testimony other than McGuire and Delacorte that basically says we didn't do this. It's not weighed against anything. It's not ‑‑ it's not ‑‑ she doesn't address the contradictory testimony, which in a jury trial would actually get an instruction. She simply says, in essence, that all you have to do to defeat a whistleblower appraisal case is to have two people come in, the manager come in and say, I didn't do it. This is the situation you faced with Miller, almost identical, where the individual complained about the quality of the Kevlar and was transferred out and proved up, the A.J.s did the exact same thing. They relied on the testimony of a warden who had a self‑interest and said that was enough. And this Court said, no, that is not enough. This Court said in Whitmore that the MSPB should stop, you know, being a backup quarterback for the agencies and look at the actual evidence and not restrain the Whistleblower Protection Act. My concern, which goes just beyond the facts, is given the facts in this case and the amount of evidence that was produced, how else could Mr. Katz have proven his case other than apparently somebody in the agency coming out and saying, I engaged in whistleblower appraisal? That is an impossible standard. That is why you have to have substantial evidence to support a clear and convincing evidence case. I know it gets a little convoluted, but the underlying thing is there has to be something and the standard of review here is not Title VII. It's not some legitimate explanation. It has to be a contributing factor. And the Court found it was a contributing factor. The A.J. then started to weigh whether these people were really desiring or retaliating or not. Some had some and some had more. But that's almost ‑‑ So motivation to retaliate is a very frequent consideration in these cases. Yes. So the fact that that was a focus of the A.J.'s discussion shouldn't come as a surprise, right? It doesn't. What comes as a surprise ‑‑ She found a low motivation to do it. What comes as a surprise ‑‑ And to call it McGuire, at least. Yeah. Well, what comes as a surprise ‑‑ Well, McGuire was ‑‑ McGuire and Delacorte as well. Yeah. Well, Delacorte had a high reason to do it. And I'll tell you why. Because the entire transfer of the contract itself was highly questionable. The reason it was highly questionable is you hired the exact same people to work on it. So it wasn't ‑‑ it wasn't being operated well. It was you were shuffling the chairs so you could give it to a guy named David Donjili, who you used to work for, who worked for Compass and Zoran Yankovic, who worked for Compass, and Barry Smallwood at Cloud Lake, who had been a senior supervisor in the DEA. So it was cronyism, pure and simple. And we know that Delacorte's testimony can't be accepted because Delacorte actually said when we pointed out that there is an ethics review panel in the DEA itself that you have to go through, his response was, I did it myself. That is the heart of this case, is that that is what Mr. Katz was complaining about, that this looked and smelled to the high heaven. And my problem with the judge's opinion is we have documentary evidence to support everything. We have evidence that they were in on the decisions ranging from everything from how much medical information to the attempts to remove his accommodation to the transfers to the reassignment, to the reassignment, not to North Carolina. That's the other thing. I think the agency's position would be stronger if they had simply reassigned my client to a position in North Carolina and said, you're not running the Katz program well. They did not do that. When they transferred the program to Washington, D.C., it collapsed. It's gone. All that money is out the window.  And again, the approval for this in the record didn't come from Michael Delacorte. It came from Robert Patterson when he was the head of the DEA. The technology was so useful because it could track people who were kidnapped. Counsel, you're arguing as if we were fact finders and the question is substantial evidence. You are into your rebuttal. You can continue or you can save it. I'll save it, Your Honor. Thank you. Thank you, Your Honor. Let's hear from the governor. Ms. Clark. Good morning, Your Honors. Elizabeth Speck for the United States. May it please the Court. We respectfully request that the Court affirm the Merit Systems Protection Board's decision. The Court has had some questions about timing. Here, although it's true, Mr. Katz began to raise concerns regarding the award to CloudLake Technology and the subcontract to Compass in August of 2017. The relevant decision maker regarding most of the personnel actions that were found to be covered personnel actions was Mr. McGuire. Mr. McGuire did not find out about the protected disclosures until March 5, 2019. And as I believe Judge Rayna had indicated, his concerns about the Katz program occurred much earlier than that. We see from the record that as of December 2018, Mr. McGuire learned from the Navy that they were calling the program Big Top because it resembled a circus with tossed overruns. And throughout December 2018, through, anyway, throughout that predating the disclosure, his concerns, he began to gather more information about the Katz program and his concerns about the management program began to grow. Turning to the Factor III, a focus of the appellant's argument was the fact that the Court did not, or the Court, pardon me, the Board did not properly, it didn't consider Factor III. Factor III is, of course, the evidence of non-whistleblowers who are similarly situated. And I think that the MSPB did a good job of going through that evidence, why she found that Mr. Katz at that time, which is, of course, pre-COVID, was relatively unique in that he was a remote employee. And then she said that that evidence, she found it essentially neutral and that it did not weigh in Mr. Katz's favor. So I don't think she gave the agency, it's a fair characterization of the record, to say that she found that weighed in favor of the agency and said she similarly, she found that there was not, that there, this was a relatively unique situation. And so she didn't, she, again, found it neutral and didn't find it to tip in the appellant's favor, which is how she phrased it in her decision. We believe, as we outlined in our brief, this case is well grounded in the record and well supported with. Yes, Your Honor. Just for a minute, let's step back to the timing issue. Yes, Your Honor. The way I understand the record is that McGuire began to assess the Katz program around the December 2018. Yes, Your Honor. Okay. The disclosures occurred on March 2019, about a year later. That's the date that he learned of the disclosure. So the initial disclosures occurred in August of 2017. But Mr. McGuire, as the MSP. The disclosures were made well in advance of the time that Mr. McGuire learned of them. Yes. Again, Mr. McGuire was the individual, his supervisor was Mr. Delacorte, but Mr. McGuire did not learn about the protected disclosures until March 5th. Here's my concern. We have an employee who is aware of events that are occurring around him. It makes a disclosure. The disclosure occurs after Mr. McGuire had already began to move towards an adverse action. How long, with respect to timing, it just seems that Mr. Katz may have waited back until he saw what was happening around him. The movement of personnel, the contract being given to somebody else, all of these are mounting employee actions. And at some point, he makes a disclosure. How much, if any, should we give to the fact that McGuire was not aware of the disclosures? I think it's a very... It's hard to... You know, McGuire inserted himself and started examining all aspects of the program, activities surrounding Mr. Katz, Mr. Katz's timekeeping, the manner... You know, he was moving toward a pretty complete investigation, but yet he never learned of the disclosures? And there was a specific finding on that? Yes, Your Honor. That's at page 41 of the joint appendix. And then there's also testimony in the record that March 5th was the day that he found out at appendix pages 405, 2580, and 2598 through 2599. So, I mean, again, the Court's looking here at whether... Up to March 2019, is Mr. McGuire's concerns only that, just concerns? Mr. McGuire... I'm not precisely sure I understand the question. Mr. McGuire did not learn of Mr. Katz's whistleblowing. He became a supervisor, as you indicated, Judge Rena, in December of 2018. I'm sorry. Yes. Actually, he became the section chief at November 12th, 2018. He began to investigate the Katz program in December of 2018. And his concerns... I mean, the Court is looking at whether the agency took adverse... Up to the time that the disclosures were made, did Mr. McGuire have only concerns? Was there actual... Did he act out on those concerns? Mr. McGuire didn't know about the disclosures until May 5th, 2019. So, Mr. McGuire was investigating the Katz program. He had talked to Ms. Hunter. He had gathered a significant amount of information. And some of the arguments that Mr... So, up to March 2019, were Mr. McGuire's concerns subjective? Was he just concerned? Yes. Yes, Your Honor. He was concerned about the management and the way that the Katz program was being managed outside of the whistleblowing. There had been no actual... Had there been action on those concerns? He, again, he did not become the... He started to take action before he knew about the whistleblowing. He had talked to... He had begun his assessment in December. He learned from the Navy. He had interviewed Navy employees. He had also talked to Ms. Hunter. As of January 2019, he had asked Mr. Katz for a detailed breakdown on how contractor employees were supporting the Katz program. January 30th, 2019, he learned there was no formally approved memorandum of agreement or understanding with Fort Bragg. And he had concerns that DEA could not bring Oracle servers to Fort Bragg. He reminded him again in February 1st, 2019, to provide a detailed breakdown about what the contractors were doing. And then in February 5th, 2019, which is, again, nearly a month before he found out about the whistleblowing, that was when he removed Mr. Katz's task monitor and replaced him with Mr. McBrayer's. And then a lot of the focus of appellant's briefing was the fact that... Was the removal of Mr. Bordenaro. But, again, that Mr. Bordenaro, pardon me, was terminated on February 12th, 2019, which also predated Mr. McBrayer's knowledge of Mr. Katz's whistleblowing. So Mr. McBrayer, I take it, went down to, made a site visit. And that was in March, early March, if I recall, of 2019. Yes, Your Honor. So by that time, presumably he had enough sources of concern that it was worth a trip down. And he found nobody home. Now, the reason that nobody was home was that nobody was in the office, was because of the accommodation that Mr. Katz had, I take it. But Mr. McBrayer was not aware of that at the time, was not aware of the accommodation, I take it. He was not aware of the accommodation at the time. He conducted the site visit on March 14th, 2019. But I think he had concerns with the fact that, although Mr. Katz may have had an accommodation, you had contractors, such as Ms. Guerra, only reporting once to work every four to six weeks, that she had not logged into the Firebird system since June of 2018. He had concerns about the fact that one of the contractors was overseen, where he testified that Ms. Guerra was overseeing the contractor who was actually at Fort Bragg's work. They had concern about the security of the servers. And then there were other concerns. Again, Ms. Guerra was overseeing Mr. Wazain. And then the office space itself was not in a classified facility, and the contractor had to have a maintenance crew, Mr. Wazain, let him into the facility. So I think there were, I think the record, Appellants Council had analogized it to Miller. I think we had a pretty careful record here with contemporaneous documentation of Mr. McGuire's testimony, which was largely backed up by either Mr. Delacorte or Ms. Hunter, and contemporaneous memoranda talking about what they found at the site and the condition of the Katz program at that time. Anything further? Nothing further from the government. Thank you. Mr. Burns has some more bubble time. Yes. A couple of things that bear on this. First of all, Mr. McGuire said he talked to Mr. Delacorte before he began this review. Secondly, the record showed that he never began the review until after, he never really took any concrete action until after Mr. Bordenaro had written that February 6th letter. Mr. Bordenaro testified that he had told, in a trip to the Navy at Dahlgren, that he had told McGuire extensively about both the accommodation and the problems with the program, and that McGuire's loyalties were clear because when Mr. Katz pointed out that this was a prony contract, when Edward Zane resigned because there was nothing for him to do, apparently, Mr. McGuire took no action except against my client. The timeline is a little skewed here. You have to believe that there were no discussions between Mr. Delacorte and Mr. McGuire regarding the whistleblower, and you have to believe that Bordenaro's lying when he said he told McGuire about his concerns in November. You have to believe that McGuire was unaware of the complaints about Mr. Edward Zane. You have to believe that it wasn't until March, suddenly, after the report that they went to the OIG and the FBI that McGuire suddenly moved into action on a program that's fine. There's also the red herring of my client's, quote, unavailability in Firebird, which was attacked, which is they don't use Firebird because it can't absorb the information that they have in the Katz program. That was testified to. The other thing is, well, he was unavailable. Well, they were working remotely with their own computers that were not on Firebird, so that wasn't an issue. And the other thing McGuire never did, interestingly, how bad this contract was run, never complained to COMPAS. He foisted everything on Mr. Katz as his responsibility after he learned about the complaints of Zane and after he learned from Bordenaro about the complaints of the project. One critical point that I think it didn't seem to us at the trial, at the trial, at the hearing, and even when briefing, but one critical issue to me is this reliance upon the Navy for the justification that there were problems. No Navy people testified. No Navy affidavits. No Navy memorandums. All those personnel were still there. That was created out of whole cloth after the fact. And so how that can be substantial evidence we didn't understand. And we didn't understand it particularly because Chip McBrayer had testified repeatedly that Eric was right about the placement of the cameras and that the project was being run just fine. I think it strains credibility. I'm not asking you to make a credibility determination. I think it strains credibility to say that despite all of this evidence, where we actually presented documents and supervisory testimony, that we lose. And the last thing I'll leave you with is I think it comes down to two events that are critical. So McBrayer testified that he had nothing to do with Bordenaro's being terminated. And until we had a separate lawsuit by Bordenaro in the Eastern District of Virginia where they sued because they were mistreated as independent contractors and Yankovich, the head of COMPASS, said no. That was solely done because of what McBrayer said. So there was an inconsistency. And in the hearing transcript, McBrayer says, oh, I misspoke. Right? That's got to count for something. And then the second part of it I think that's really critical in all this analysis is the idea that McBrayer really had no explanation for why the program should be shipped to Washington when there was nobody to work on it. There was not a single employee up in Washington, D.C. to work on this program when he transferred it. Those things undermine the strength of that testimony and I think undermine the substantial evidence. And the judge, in her opinion, never weighed that against the testimony of witnesses. It's not our burden to prove that we are right. It's our burden to prove that this was a contributing factor and this was clear and convincing and there wasn't substantial evidence to support the verdict. So thank you. Thank you, counsel. The case is submitted.